Filed 5/30/23  P. v. Buchanan CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE, | B316996 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA450667) |
| v. | |
| KEENON JAMAL BUCHANAN, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge. Affirmed.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

The jury found Keenon Jamal Buchanan, Jr., guilty of felony murder (Pen. Code,[1] §187, subd. (a)), and found true the special circumstance that Buchanan committed the murder during the commission of a burglary (§ 190.2, subd. (a)(17)). The trial court sentenced Buchanan to life in prison without the possibility of parole.

On appeal, Buchanan contends: (1) counsel improperly conceded that Buchanan committed robbery; (2) counsel's concession to Buchanan's guilt violated Buchanan's Sixth Amendment right to effective assistance of counsel; (3) the prosecutor committed misconduct; (4) Buchanan's ineligibility for a youthful offender parole hearing under section 3051, subdivision (a) violates equal protection; and (5) Buchanan's sentence of life without the possibility of parole violates the Eighth Amendment.

We affirm the trial court's judgment.

**FACTS**

*The Murder*

In September 2016, roommates Benjamin Wakrat and Richard Hong lived in the Hollywood Hills. Jacques Hyzagi and Emily Lembo lived in a unit to the left of Wakrat and Hong's unit. There was a pathway between the two units, which was accessed by a single stairway with several gates. A patio behind Wakrat and Hong's unit was also gated. The path to the patio

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

gate was not visible from the street and only accessible through a narrow opening between two houses with several twists and turns. Wakrat and Hong kept the padlock on the gate closed so that it would appear secure, but usually left it unlocked because Hong did not have keys for it.

On September 22, 2016, Wakrat and Hong attended an event in Venice Beach until around 8:30 or 9:00 p.m. Wakrat went to a bar afterwards, but Hong told Wakrat he was going home.

Hyzagi and Lembo also went out that evening. Hyzagi got home around midnight. When Hyzagi parked his car, he noticed a tent on the garage floor that was out of place. As he walked up to his unit, Hyzagi noticed that there was a light on over the door leading to Wakrat and Hong's unit. There was a chair on their steps and a sign that said something like, " 'Keep away. There is a— . . . gun in the house.' " Hyzagi thought it was a joke. As Hyzagi passed Hong's door to get to his unit, he heard someone say, " 'Leave at once, or I'll call the police.' " Hyzagi had his headphones on so he was not certain whether the voice came from behind the door or the terrace. He went downstairs to see if someone was there, but he did not see anyone. When he passed Wakrat and Hong's unit, Hyzagi heard a voice from behind the door again say, " 'Leave at once, or I'll call the police.' " Hyzagi disregarded the voice and went home.

Lembo returned around 1:20 a.m. She saw a sign in front of Wakrat and Hong's unit that said something like, "If you enter, you will be shot."

Sometime after Lembo returned, Hyzagi went down the stairs to take the trash out. When he came back upstairs, Buchanan was standing in front of Wakrat and Hong's unit with

3

his back towards Hyzagi, closing the door.  Buchanan said, " 'Oh, I'm so sorry.  I didn't realize you were the next-door neighbor.  I am sorry about what I told you earlier.' "  Buchanan was courteous, civil, and poised.  Hyzagi assumed he was coming from a party or dinner.  Hyzagi told Buchanan not to worry about it.  Once back in his unit, Hyzagi became suspicious, because he realized that Buchanan referred to him as the next-door neighbor.  Hyzagi turned off the lights and went into his living room to watch Buchanan from a large front window.

Lembo came out of the bedroom and told Hyzagi that someone had tried to break into their house.  A window screen had been popped open and there was a grilling utensil on the couch outside.  Lembo called 911 to report the burglary at 2:13 a.m.[2]

While Lembo called 911, Hyzagi called Wakrat and asked if he had a guest staying at his house.  Wakrat said he did not, but that Hong should be there and was probably sleeping.  Hyzagi told Wakrat that someone had broken into Hyzagi and Lembo's unit, that a man just left Wakrat's house, and that Wakrat should come home.  Wakrat left to come home immediately.

Wakrat got home sometime between 2:13 and 2:32 a.m.  When Wakrat arrived, the outside of his door was barricaded and there was a sign that read, " 'Stay off this property . . . intruders will be shot. . . .' "  Wakrat knew something was wrong because although the sign belonged to the owner of the unit, it had been put away upstairs and there was no reason for it to be outside.  Wakrat stepped inside and almost tripped on Hong's body, which

_____

[2] When the operator returned her call at 2:32 a.m., Lembo reported a murder.

was under a white tarp just inside the front door. Wakrat pulled the tarp aside and saw that Hong's face was smashed in. He tried to revive Hong, although he believed Hong was dead. Wakrat went through the house to make sure no one was there. Then he ran outside and warned Hyzagi not to go inside because Hong was dead.

From the porch, Wakrat and Hyzagi spotted a person walking nonchalantly down the street. Hyzagi recognized the man as the person who had been inside Wakrat's house. Wakrat ran inside his unit to get a baseball bat that was usually kept just inside the front door, but it was gone. He went into the living room and picked up a sledgehammer he and Hong had used for camping and immediately realized that it should not have been in the living room; it was normally stored in the storage room just off the foyer. Wakrat realized that the sledgehammer had blood on it, so he put it down where he found it and went back outside.

Wakrat and Hyzagi followed Buchanan down the street. Wakrat thought that Buchanan was surprisingly well-dressed in light of the state of the unit. Buchanan was wearing bright white shoes, dark-colored pants, and a dark jacket. Hyzagi called after Buchanan. Buchanan ran, and Wakrat and Hyzagi pursued him, but Hyzagi lost sight of Buchanan after Buchanan turned down Las Palmas Avenue. By the time Wakrat and Hyzagi returned to the house, the police had arrived.

Wakrat walked through the unit with Los Angeles Police Department Detective Scott Masterson. He noticed that many things were out of place. A Play Station that had been packed away was unpacked and plugged in. A pair of jeans Wakrat bought a few weeks earlier that were hanging by the front door

were gone, and a pair of jeans Wakrat did not recognize were on a chair by the dining room table. Wakrat was missing several pairs of Air Jordan shoes and a leather jacket. When Wakrat saw that his clothes were missing, he realized that Buchanan could have been wearing them. Wakrat also noticed items out of place on the back patio, which looked ransacked. A surf board that had been put away upstairs was outside on the deck.

It was later determined that Hong died from multiple blunt force injuries to the head and chest. He suffered multiple extensive skull fractures. The sledgehammer found in the foyer was consistent in size, shape, and weight with the type of object that was used to inflict the injuries.

### The Investigation

Terence Maloy lived in the Hollywood Hills, about a three or four-minute walk from Wakrat and Hong. At around 8:25 p.m. on September 22, 2016, Maloy heard loud knocking on the gate in front of his recycling bin, one flight below the front door of his home. There was a public staircase with two landings that led from the street to Maloy's and his neighbor's hillside homes. The recycling bin was located on the first landing. Maloy opened the gate and saw a young man who appeared to be distressed. The man asked Maloy to help him. Maloy asked him to leave, locked the gate, and went back inside. Afterwards, Maloy became concerned because the house next door was vacant. He went to see where the man was and saw him talking with the neighbors two houses away, Eric Finkelstein and Jeffrey Stevens. Maloy went over and asked the man to leave.

Finkelstein and Stevens had discovered the man in the courtyard behind their gate. Finkelstein opened the window and asked the man if he could help. The man responded that he was hungry and lost. Finkelstein told him to meet him on the street in front of the garage. Finkelstein and Stevens went outside and gave the man an apple, water, and $20. The man said his name was Jamal and he was from Chicago. Maloy approached and told them not to talk to the man, so Finkelstein went inside. Stevens later identified Buchanan in a photographic line-up as looking like the man who had asked for a handout that evening.

Cell phone records revealed that someone called Kandice Yourist from Hong's phone after the murder. Yourist lived in Arizona. She had dated Buchanan, but they broke up around the beginning of 2016. On September 23 and 24, 2016, Yourist received calls from Buchanan. He said he was in Phoenix and asked her to pick him up. Yourist was surprised because she thought Buchanan was in Las Vegas living with his family. When she picked him up, Buchanan was wearing a T-shirt and had a towel wrapped around his waist. He was carrying a backpack and he smelled bad. Buchanan told Yourist he came to Arizona to start a new life with her, but Yourist did not want anything to do with him. Buchanan used a gold debit or credit card, but would not tell Yourist where it came from. The homepage of the cell phone he was using had a picture of a family who appeared to be Caucasian.

Law enforcement acquired Yourist's address through phone records and arrested Buchanan in Arizona on October 1, 2016. He was wearing a pair of Air Jordan tennis shoes when he was arrested. The parties stipulated that Hong's cell phone was recovered from Buchanan's person in Arizona.

In early October, Hong's sister received his wallet and other belongings from the owner of the unit that Hong and Wakrat had been living in. Hong's driver's license was in the wallet, but there was no cash, or ATM or credit cards.

A neighbor who lived between a quarter to a half-mile away from Wakrat and Hong's unit submitted her security camera video footage capturing activity from noon to approximately 7:00 p.m., on September 22, 2016. Yourist identified Buchanan in the video. Maloy stated that the man's appearance was consistent with the person depicted in the video. Maloy stated that the jeans found draped over the dining room chair in Hong's apartment were "very consistent" with what the man he saw was wearing.

The jeans found hanging over a dining room chair in Hong's residence contained a mixture of DNA from Buchanan and a second, unidentified person. A DNA swab from the head of the sledgehammer matched Hong's DNA.

## DISCUSSION

### *Burglary Concession*

" 'Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial.' (*Boykin v. Alabama* (1969) 395 U.S. 238, 243 (*Boykin*).) These include the privilege against self-incrimination, the right to trial by jury, and the right to confrontation. (*Ibid*.) The effect of a stipulation for purposes of *Boykin* 'is defined by the rights a defendant surrenders.' [Citation.] A stipulation that admits all of the elements of a charged crime necessary for a

conviction is tantamount to a guilty plea. [Citations.] Accordingly, the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights." (*People v. Farwell* (2018) 5 Cal.5th 295, 299–300.)

Buchanan contends that reversal is required because his trial counsel's concession that he committed burglary was tantamount to a plea of guilty and was made without obtaining Buchanan's knowing and voluntary waiver under *Boykin, supra*, 395 U.S. 238, and *In re Tahl* (1969) 1 Cal.3d 122. The contention lacks merit.

At trial, defense counsel did not contest that this was a "gruesome" murder. He conceded that Buchanan stole from Wakrat and Hong, but argued that the prosecution was attempting to bootstrap the murder using the burglary, despite insufficient evidence to support the murder charge. He asserted that all of the evidence suggested Buchanan was merely a thief. Buchanan was not acting as a violent murderer would: he encountered and spoke with several people in the neighborhood, knocked on doors, and was not carrying a weapon. The prosecution could not prove he murdered Hong beyond a reasonable doubt based on the evidence.

In so arguing, counsel did not concede all elements of a charged crime. First, contrary to his assertions in the briefs, Buchanan was *not* charged with burglary.[3] Trial counsel appears to have been confused on this point, likely because it was necessary for the jury to find that Buchanan committed a burglary before it could find Buchanan guilty of felony murder or

---

[3] Buchanan was initially charged with the burglary of Alper Sevimli, but that charge was dropped.

find the felony-murder special circumstance true. However, there was no independent burglary charge to which counsel could have conceded.

Second, although the jury was required to find that Buchanan burglarized Wakrat and Hong's unit to convict him of murder under the prosecution's theory of the case, counsel's concession to the burglary did not relieve the prosecution of the burden of proving that Buchanan killed Hong in the course of the burglary. Rather, commission of the burglary established only the requisite mental state for the felony murder charge. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80–81[intent to commit the underlying felony supplies mental state for felony murder].) The jury was instructed under CALJIC No. 8.21 that: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of burglary is murder of the first degree *when the actual killer had the specific intent to commit that crime.*" (Italics added.) There was no evidence that any person other than Buchanan participated in the burglary. As a consequence, to prove that Buchanan committed murder, the prosecutor had to prove: (1) Buchanan intended to commit the burglary; (2) Buchanan committed the burglary; (3) *Hong was killed during Buchanan's commission of the burglary*; and (4) *Buchanan was the actual killer*. Defense counsel strongly contested that Hong died in the commission of the burglary and that Buchanan was the actual killer. Absent a complete concession, the court was not required to advise Buchanan under *Boykin* and *Tahl*. (See, e.g., *People v. Cain* (1995) 10 Cal.4th 1, 29–31 [*Boykin/Tahl* admonition not required where counsel did not concede all charges].)

10

### *Ineffective Assistance of Counsel*

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance . . . . [A] conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, Buchanan's counsel was not asked the reasons for conceding a burglary, and Buchanan contends the concession was without a tactical purpose and satisfactory explanation. However, a trial counsel's concession to "various degrees of guilt" for the sake of maintaining credibility with the jury is often a valid trial strategy. (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Consequently, our Supreme Court has repeatedly rejected claims of ineffective assistance made on this basis. (*Ibid.*)

11

Here, the rational tactical purposed for counsel's concession that Buchanan burglarized Wakrat and Hong's home is apparent from the overwhelming evidence of that burglary; had counsel argued otherwise, he would have likely lost credibility in the eyes of the jury, and with it any opportunity to secure an acquittal on the murder charge.

Multiple witnesses who lived in the neighborhood encountered Buchanan on their private property—which was set back significantly from the street and impossible to access without climbing numerous stairs and entering through private gates—just hours before he was in Wakrat and Hong's unit. Buchanan was depicted in surveillance video footage taken that evening. Hyzagi testified that he observed Buchanan closing the door to Wakrat and Hong's unit and that he spoke with Buchanan while Buchanan was still on the property. Buchanan's DNA matched a DNA sample obtained from the jeans found draped over a chair inside Wakrat and Hong's unit. A witness testified that the jeans were consistent with the jeans he saw Buchanan wearing earlier in the evening. Shortly after Buchanan had been in the victims' unit, Hong's cell phone was discovered in Buchanan's possession, and the phone had been used to contact Buchanan's ex-girlfriend. Buchanan was also seen wearing items of clothing consistent with Wakrat's missing clothing. In sum, the evidence suggested that Buchanan was in the area entering private property without permission, had been inside Wakrat and Hong's unit, and took items from the unit. In light of this evidence, Buchanan cannot demonstrate that counsel's performance was deficient or that he was prejudiced by counsel's concession to the burglary.

Buchanan complains that he was prejudiced by counsel's "preposterous" argument that he "committed the burglary while some other unidentified person at some other unidentified time committed the murder and [he] just happened to burglarize the same home around the same time." We disagree. It is not uncommon for defense attorneys to argue that someone else may have committed a crime as a means of creating reasonable doubt as to the defendant's guilt, even where there is not sufficient evidence to warrant a third-party culpability instruction. Here, counsel opted to proceed with a defense that relied on the beyond-a-reasonable-doubt standard—i.e., that the prosecution had not met its burden to show that Buchanan killed Hong because evidence of the burglary was not sufficient to support the conclusion that he committed the murder under that stringent standard of proof.

Buchanan contends he was prejudiced because counsel's chosen defense precluded him from arguing that he did not intend to take anything at the time he entered Wakrat and Hong's unit but instead sought to " 'make himself at home,' " by playing video games and listening to music while the occupants of the unit were absent. Buchanan asserts that "[t]he evidence . . . strongly suggested that Hong came home and confronted [him]; that [Buchanan] apparently responded in a homicidal rage; and, **after the killing**, [Buchanan] decided to steal some clothing, money and Hong's cell phone." (Emphasis in original.) While we recognize that under the felony murder theory such an argument could *technically* lead to an acquittal (felony murder requires that the defendant killed the victim during the course of the felony), we cannot fathom that it would. The notion that counsel was ineffective for conceding the burglary in order to preserve the

13

argument that Buchanan was not the killer, but would have been effective by instead conceding that Buchanan was the killer—who, after killing his victim, decided to commit burglary—borders on the absurd.  Further, it ignores the overwhelming record evidence of Buchanan canvassing the area in an attempt to obtain essential items earlier in the evening, and then stealing such items from Wakrat and Hong's home.

The record does not affirmatively demonstrate that counsel had no reasonable reason for his tactical choices, or that the choices made cannot be satisfactorily explained.  Further, the same overwhelming evidence of the burglary precludes Buchanan from showing he was in any way prejudiced by counsel's trial tactics.  His ineffective assistance of counsel claim fails.

### Prosecutorial Misconduct

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  [¶]  " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—

14

and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " ' [Citation.] A defendant who fails to object at trial 'waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1402–1403.)

Buchanan contends the prosecutor committed misconduct by misleading the court as to the propriety of admitting gruesome photographs, eliciting testimony about irrelevant gory details of Hong's death, and making statements in closing argument that lightened the People's burden of proof. To the extent that counsel failed to timely object, Buchanan claims that counsel provided ineffective assistance. His claims lack merit.

## Photographs of the Victim and Explicit Testimony

The information charged Buchanan with murdering Hong with malice aforethought. The People's trial brief stated that the prosecution intended to proceed on a felony murder theory with burglary as the underlying felony. In a concurrently filed motion, the People moved to introduce Buchanan's confession, made in a statement to officers. In the statement, Buchanan claimed that Hong came down the stairs with something in his hand, and that he killed Hong in self-defense. The prosecution also moved to introduce photographs of Hong, including crime scene and coroner's photographs, to demonstrate that Buchanan directed his attack at Hong's head and show that the killing took place inside Hong's residence. The prosecutor proposed to use the photos to demonstrate malice and intent, for impeachment, and

15

to clarify the testimony of witnesses regarding the crime scene and autopsy.[4]

At a pre-trial hearing on the motions, the trial court stated that it would permit argument regarding the cumulative effect of the photos, but indicated that the crime scene photos were relevant to the circumstances of the crime. The photos were admissible "[f]or premeditation, deliberation, and for actions of self-defense, and as far as the coroner's photographs are concerned, there may be some relevance as to the manner of death and to help explain the coroner's testimony."

In a hearing later that afternoon, the court noted that the People had filed a generic murder information by alleging malice murder. The court stated that the accusatory pleading permitted the prosecution to proceed on a felony murder theory—because the information alleged malice murder, malice murder was a lesser included offense. The prosecutor confirmed that the People were proceeding on a felony murder theory. The prosecutor stated that the People were considering whether to amend the information to charge felony murder only, but the issue had not yet been decided. He stated that it was unlikely that the People would follow that course. The court responded that because the information charged malice murder, the court would be required to instruct on malice murder and any applicable defenses, including self-defense and unreasonable self-defense, if they were supported by substantial evidence in the record. The court stated that it would allow defense counsel to argue self-defense or imperfect self-defense if supported.

---

[4] The opening brief inaccurately states that these grounds were not set forth in the prosecutor's motion.

16

The court returned to its ruling on the admissibility of the photos of the victim, which included six crime scene photos and six coroner's photos. Defense counsel objected to the crime scene photos, but made no substantive argument. The court ruled the crime scene photos admissible, explaining, "They show the nature of the wounds . . . [I]f it's for purposes of malice murder, for premeditation and malice itself, and to rebut any issue of self-defense for purposes of felony murder, it just shows the–that this is not an accident and seems to also rebut some of the statements of the defendant, . . . . Photos of the victims in murder cases may be gruesome, but not unduly so if relevant for some issue it [*sic*] can be proven. Victims—supposed victims in murder cases are always disturbing. The defense does not mandate their exclusion. I find based upon what they are proffered for . . . [the probative value] outweighs prejudice to the defendant, and the crime scene photos will be allowed."

Defense counsel argued that the coroner's photos were cumulative. The court responded that the photos were of the victim before and after he had been washed. "This helps the coroner in explaining his findings and causes of death. It also explains the nature and placement of the wounds as indicated by the coroner, and it shows the savage beating that was taken, and I don't find these to be cumulative or duplicative at all." The court further observed that the potential prejudice did not outweigh the probative value of the photos, and that there were not many photographs.

In opening statement, the prosecutor told the jury that Los Angeles Police Department Officer James Decoite, who was the first to arrive at the scene, said that he did not have to review his notes before testifying in this case. The prosecutor emphasized,

17

"You're going to hear that normally they have to read reports to remember which home they were at, which bloody scene it was, whether it was one with two guns and a knife, or two knives and a gun, because some of their cases run together. Not this one. He said he didn't have to read anything. He remembered it. He remembered it clear as day. You can see why." The prosecutor stated that Hong had been struck "directly in the skull" multiple times. "[I]t was a brutal killing. [Buchanan] literally bashed in the side of his skull." The diameter of the hole in Hong's head matched the head of the hammer.

Officer Decoite testified that in the 12 years he had been an officer he had gone to the scene of more than five murders. The prosecutor asked if the details of the murders ran together. The officer responded, "[S]ome are more unique than others, stand out to me." Officer Decoite did not need to review his files in this case. He testified, "I've seen dead bodies before." "But not with that type of violence." The prosecutor showed the officer photos depicting Hong's body and the crime scene and asked if they were consistent with the officer's recollection. The officer confirmed that they were. He testified that he would not forget the photographs.

Deputy medical examiner for the County of Los Angeles Brice Hunt testified for the prosecution. After reviewing the photographs of Hong, Hunt reached the conclusion that the cause of Hong's death was blunt force trauma. He believed that Hong had received a minimum of three to four blows to the head, in addition to chest injuries. The prosecutor asked Hunt why he could only estimate the number of blows to Hong's head. Hunt explained, "It would be similar to if you dropped an egg and the shell of the egg shattered. Most of us are familiar with how that

shatters in multiple pieces and not just one or two single lines. So[,] it's difficult to count up all the areas of the skull that were fractured, but you could see there are grossly numerous between the pterion, the round part of your skull, and the base of your skull, which is what your brain sits on." When asked if he would consider this to be a violent or non-violent homicide, Hunt replied, "I would consider this to be a violent death." The prosecutor showed Hunt multiple photos of Hong's body, which Hunt used to explain his injuries to the jury.

During trial, after the majority of the witnesses for the prosecution had testified (including Officer Decoite and Hunt), the People moved to preclude Buchanan from claiming self-defense or receiving a self-defense instruction based on his confession to officers. The People argued that the prosecution was proceeding on a felony murder theory and the facts did not support self-defense. There was no dispute that Buchanan intruded into Hong's home. Hong was legally and presumptively privileged to assert deadly force against intruders.

In a hearing outside the presence of the jury, the court noted that although malice murder and associated defenses may be applicable in a case where malice murder is charged, they are only applicable if supported by substantial evidence. The prosecutor announced his intention to proceed solely on the felony murder theory based on the evidence adduced and Buchanan's recent stipulation that police discovered Hong's cell phone in his possession. The prosecutor requested that he be permitted to argue if Buchanan's statement that he acted in self-defense was later admitted. Buchanan chose not to testify, and his statement to officers was not admitted into evidence. Defense counsel requested that the jury be instructed on both malice

murder and self-defense, but the trial court denied the motion for lack of substantial evidence to support giving the instructions.

### *Analysis*

Buchanan contends that the prosecutor breached his duty of candor by failing to inform the court that the photos of Hong the court had tentatively admitted were no longer relevant, because the prosecutor did not intend to proceed on a malice theory of liability, which was the basis for the photographs' admission. He further contends that the prosecutor breached his duty to warn witnesses against volunteering inadmissible statements and to refrain from eliciting such testimony. Defense counsel did not object on the basis of prosecutorial misconduct at trial and thus forfeited the issues. However, because Buchanan now claims counsel was ineffective for failing to object, we address the merits of his claims. We find no misconduct.

The prosecutor did not breach the duty of candor. The trial court was fully aware that the prosecution was proceeding on a felony murder theory when it made both its tentative and final rulings on the photographic evidence. The court highlighted that unless there was insufficient evidence in support, the court would instruct on malice murder, unreasonable self-defense, and self-defense, and the defense could elect to argue those theories.

Regardless, the photographs and testimony were relevant to the prosecution's case and not unduly prejudicial. When the photographs were admitted and the officer and medical examiner testified, malice murder and self-defense were still available to Buchanan. The People bore the burden of proving Buchanan's

guilt and had to rebut self-defense and malice murder while there was still a possibility that those theories could come into play.

" 'In a prosecution for murder, photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred . . . .' " (*People v. Scully* (2021) 11 Cal.5th 542, 590.) The manner of death was highly relevant to the People's felony murder theory. The fact that Hong was killed inside his home with a weapon that was obtained from the home supported the prosecution's argument that Buchanan did not enter the apartment with the purpose of killing Hong, but rather that the murder took place during the commission of the burglary.

The photographs were also admissible to corroborate the testimony of witnesses to the crime scene and the medical examiner. (*People v. Scully, supra*, 11 Cal.5th at pp. 590–591.) " '[A]utopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes.' " (*Id*. at p. 591.)

It was proper for the examiner to testify about Hong's wounds. The People were entitled to prove the manner and means of Hong's death through any relevant evidence—the prosecutor is not limited to photos or to witness testimony. (See *People v. Scully, supra*, 11 Cal.5th at pp. 590–591.) As our Supreme Court recently emphasized, "[p]hotographs of victims in murder cases are always disturbing. [Citation.] ' "The photographs at issue here are gruesome because the charged offense[] w[as] gruesome, but they did no more than accurately portray the shocking nature of the crimes." ' " (*Id*. at 591.) The

same is true of testimony in a case of this nature. The officer remembered the murder clearly because it was horrific. Similarly, the medical examiner's description of the wounds was disturbing because the wounds were disturbing. Neither witness testified excessively. The prosecutor had no duty to prevent the witnesses from giving relevant, probative testimony. As we find no misconduct by the prosecutor, Buchanan's claim that his counsel was ineffective for failing to object on that ground necessarily fails. (See *People v. O'Malley* (2016) 62 Cal.4th 944, 1010, fn. 12.)

**Prosecutor's Closing Remarks**

In closing argument, the prosecutor argued:

"You all should be empowered to make reasonable inferences in this case. The reasonable inference, a person leaving a home with a dead body in the doorway and stolen property on them, [is that] in the course of committing that burglary, they killed the person inside.

"When you add in all of the extra facts and keep going over the phone, the jeans, the shoes, all of those things, that's where you end up with this belief. Just go back for a moment. One of the other analogies we use all the time in courtrooms . . . . If you see a person outside in the hallway with a raincoat on, the raincoat is wet, what is the reasonable interpretation from that? Sometimes people will say, 'Well, it's possible that they walked through a sprinkler and it got wet that way.' Okay. It's possible. But you're supposed to provide the reasonable inference from that, and the reasonable inference is it's raining outside. When you see smoke . . . the reasonable inference is that where there is

smoke, there is fire on the other side of the mountain. Sometimes people will say, 'Well, maybe there is a broken pipe and there is . . . steam. . . .' Probably not. And the smoke is colored that way, a very large plume of smoke. It's pretty obvious that's a fire on the other side of the mountain. That's the reasonable interpretation. From circumstantial evidence, you are to take that reasonable interpretation that exists.

"In terms of interpreting the evidence, I would ask you to consider Occam's razor. Here is what it says. The simplest explanation is always the best explanation. . . . What is the simple explanation in this case? These shoes, someone out of that house, were stolen by the burglar who did the killing. That's Mr. Buchanan.

"Mr. Buchanan was there at midnight, doesn't leave until 2:30 or so in the morning. He's there at midnight. . . . It is not plausible to believe that Mr. Buchanan burglarized a home where a person had already been killed, and then stayed for multiple hours. That is not a reasonable inference [from] the evidence, and it would violate the notion of Occam's razor, as well. That would not be the simplest explanation."

The prosecutor continued, "I want to talk for a moment about the different standards of proof that exist in different types of cases." He set forth the preponderance of the evidence and clear and convincing evidence standards for civil cases. With respect to the clear and convincing evidence standard, the prosecutor stated, ". . . it's not up to reasonable doubt standard, but it's greater than preponderance of the evidence." The prosecutor also mentioned the reasonable suspicion and probable cause standards for searches and seizures. He then addressed reasonable doubt: "In addition, reasonable doubt is the same

standard used for traffic tickets, as well. It's a criminal offense, and as [a person accused of committing] a criminal offense you are entitled to the benefit of a reasonable doubt if you're an accused. So those are the different ways in which you use different proof standards."

Defense counsel objected that the prosecutor's comments misstated the burden of proof. The court overruled the objection.

The prosecutor continued, "Just to be clear . . . I am not telling you what the burden is. I am not defining 'reasonable doubt.' I am explaining that reasonable doubt is used in our system and where different standards of proof apply in different ways. The instruction for reasonable doubt will be in the pamphlet—in the packet that's handed to you in the jury room. And I encourage you to follow the standards that are there. If anything I've said is inconsistent with that, please just follow the instructions."

### *Analysis*

Buchanan contends that the prosecutor's comments misstated or trivialized the People's burden of proof. Buchanan forfeited these issues by failing to object on the basis of prosecutorial misconduct in the trial court, but he again claims counsel was ineffective for failing to object. We find no misconduct, but even if misconduct had occurred, Buchanan did not suffer prejudice. His ineffective assistance of counsel claims fail.

" ' " [In closing statements,] the prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom.' " [Citation.] . . . .'

[Citation.] 'When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]' [Citation.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Spector, supra,* 194 Cal.App.4th at p. 1403.)

Buchanan complains that the prosecutor improperly suggested that the jury should rely on the theory of Occam's razor—the theory that the simplest explanation is usually the correct one—and misled the jury into believing that the People need only prove that their explanation of the evidence was reasonable to conclude that he was guilty of murder beyond a reasonable doubt.

Viewed in context, when he discussed Occam's razor, the prosecutor was explaining to the jury how to evaluate circumstantial evidence and the reasonable inferences that could be drawn from the evidence. "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument" (*People v. Centeno* (2014) 60 Cal.4th 659, 666), and it is permissible for a prosecutor "to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory" (*id.* at p. 672). Here, the prosecutor argued that when the facts were viewed together, the reasonable interpretation was that Buchanan killed Hong in the

course of committing a burglary. In contrast, it would be unreasonable to believe that Buchanan burglarized a home after discovering a dead body inside and then stayed in the home for several hours. The prosecutor was well within permissible bounds in arguing that the defense theory was not reasonable, but that the simplest explanation was.

Buchanan also contends that the prosecutor's statement that the beyond-a-reasonable-doubt standard applies to traffic tickets trivialized the standard and thus rose to the level of misconduct. We share the concern Buchanan expresses, and emphasize that we do not approve of the argument made here: traffic ticket trials bear little resemblance to the proceedings at issue in this special circumstances murder trial. The prosecutor's argument was, however, a correct statement of the law: the beyond-a-reasonable-doubt standard applies to all criminal prosecutions. (§ 1096; see also *People v. Datt* (2010) 185 Cal.App.4th 942, 948–949.) As such, and contrary to Buchanan's assertion, the prosecutor's comments here differed from the comments made in *People v. Nguyen* (1995) 40 Cal.App.4th 28. In *Nguyen*, the prosecutor argued: " 'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes.' " (*Id*. at p. 35.) The *Nguyen* court did not hold the prosecutor's statement that the beyond-a-reasonable-doubt standard applied to all criminal cases improper. It faulted the

prosecutor for stating that the reasonable doubt standard was something people employed daily when deciding to marry or even to change lanes. (*Id*. at p. 36.) Quoting our Supreme Court in *People v. Brannon* (1873) 47 Cal. 96, 97, the *Nguyen* court admonished: " 'The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required. . . . There must be in the minds of the jury an abiding conviction, to a moral certainty, of the truth of the charge, derived from a comparison and consideration of the evidence.' "[5] (*Ibid*.) Here, the prosecutor did not equate the beyond-a-reasonable-doubt standard with making everyday decisions. He accurately stated that the standard applies in all criminal prosecutions.

Further, Buchanan has not demonstrated that the jury would have interpreted any of the prosecutor's remarks in a way that would cause it to hold the People to a lesser burden of proof. The prosecutor emphasized that he did not purport to define the beyond-a-reasonable-doubt standard. He advised the jury that the standard was set forth in the instructions that the court

---

[5] Although the *Nguyen* court disapproved of the prosecutor's argument, it held that the defendant was not prejudiced by his counsel's failure to object to the remarks, because the prosecutor later directed the jury to follow the court's instruction and the court properly instructed the jury regarding the beyond-a-reasonable-doubt standard. (*People v. Nguyen*, *supra*, 40 Cal.App.4th at pp. 36–37.)

27

would give them, and told the jury that if his statements conflicted with the definition contained in the instruction in any way, the jury should follow the instruction.  The trial court instructed the jury under CALJIC No. 1.00 that if the attorney's arguments contradicted the law as stated by the court, the jury must follow the court's instructions.  The court properly instructed the jury regarding reasonable doubt under CALJIC No. 2.90.  The jury is presumed to have understood and followed the court's instructions.  (*People v. Pearson* (2013) 56 Cal.4th 393, 477.)

Finally, even in *Nguyen*, where the court disapproved of the prosecutor's argument, it held that the defendant was not prejudiced by his counsel's failure to object to the remarks, because the prosecutor later directed the jury to follow the court's instructions and the court properly instructed the jury regarding the beyond-a-reasonable-doubt standard.  (*People v. Nguyen*, *supra*, 40 Cal.App.4th at pp. 36–37.)  The same is true here: Buchanan has failed to show any prejudice from the alleged misconduct or counsel's failure to object to the prosecutor's arguments.

### *Youth Offender Parole Hearing*

Section 3051 requires the Board of Parole Hearings to conduct a "youth offender parole hearing" during the 15th, 20th, or 25th year of a defendant's incarceration if the defendant was 25 years old or younger at the time of the controlling offense. (§ 3051, subd. (b)(1)–(3).)  " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."  (§ 3051, subd. (a)(2)(B).)  As

pertinent here, "[a] person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration." (§ 3051, subd. (b)(3).) Several categories of juvenile and young adult offenders are excluded from eligibility pursuant to section 3051, subdivision (h), including those offenders, like Buchanan, who were "sentenced to life in prison without the possibility of parole ([LWOP]) for a controlling offense that was committed after the person had attained 18 years of age."[6] Our Supreme Court has held that offenders who are eligible for youth offender parole hearings are entitled to what is now known as a *Franklin* hearing, "to provide an opportunity for the parties to make an accurate record of the juvenile [or youth] offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors [at a hearing held pursuant to section 3051]." (*People v. Franklin* (2016) 63 Cal.4th 261, 284.)

Buchanan moved for a *Franklin* hearing in the trial court. The court denied the motion because Buchanan's LWOP sentence rendered him ineligible for a youth offender parole hearing. On appeal, Buchanan contends that section 3051 violates equal protection principles by excluding youthful offenders[7] like

---

[6] Buchannan was 22 years old at the time of the controlling offense.

[7] Youthful offenders are young adult offenders between 18 and 25 years of age.

himself, who were sentenced to LWOP based on a felony murder special circumstance finding, from eligibility for a youth offender parole hearing.  Buchanan argues that youthful offenders convicted of special circumstance felony murder[8] and sentenced to LWOP are similarly situated to parole-eligible youth offenders convicted of first degree murder, and that there is no rational basis for distinguishing between the two groups.

"When[, as here,] no suspect class and no fundamental right is implicated, '[i]n order to decide whether a statutory distinction . . . is unconstitutional as a matter of equal protection, we typically ask two questions.  We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citation.]  If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. [Citation.]  A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. [Citations.]  The underlying rationale for a statutory classification need not have been "ever actually articulated" by lawmakers, and it does not need to "be empirically substantiated." [Citation.]  Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational. [Citation.]' [Citation.]  [¶]  These two questions are not wholly independent.  If there is a rational basis for the

---

[8] We refer to a conviction of felony murder with a felony-murder special circumstance true finding as a "special circumstance felony murder" conviction.  This case does not involve other special circumstances, and we do not opine on or refer to other special circumstance findings here.

30

unequal treatment, then in that respect, the two classes are not similarly situated. Conversely, if the two classes are not similarly situated, that, in itself, is a rational basis for unequal treatment." (*People v. Ngo* (2023) 89 Cal.App.5th 116, 122–123 (*Ngo*).) We review an equal protection claim de novo. (*People v. Montano* (2022) 80 Cal.App.5th 82, 114.)

Buchanan focuses on the relative culpability of the two groups to support his position that youthful offenders who commit special circumstance felony murder are similarly situated to youthful offenders convicted of first degree murder who are eligible for parole. Buchanan argues that when the defendant is the actual killer, the "quantum of proof" required for the felony murder conviction and the felony murder special circumstance is identical. Based on this premise, Buchannan reasons that actual killers convicted of special circumstance felony murder are no more culpable than defendants convicted of felony murder without a special circumstance finding, and are therefore similarly situated for purposes of equal protection. Buchanan further argues that an actual killer convicted of special circumstance felony murder is similarly situated to a youthful offender who committed intentional murder because the actual killer convicted of special circumstance felony murder did not necessarily intend to kill and may therefore be *less* culpable. He asserts that because their culpability is equal to or less than that of youthful offenders who commit first degree murder but are parole-eligible, there can be no rational basis for denying youthful offenders convicted of special circumstance felony murder a youth offender parole hearing.

Buchanan's contention rests upon two faulty premises: (1) that for an actual killer the felony murder special

31

circumstance true finding requires the same proof as the underlying felony murder conviction; and (2) that a youthful offender convicted of intentional murder is more culpable than one convicted of special circumstance felony murder.

Although "there is little semantic difference between felony murder based on [burglary] under section 189 (a killing 'committed in the perpetration of . . . [burglary]') and the [burglary] murder special circumstance under section 190.2, subdivision (a)(17) (a killing 'committed while the defendant was engaged in . . . the commission of. . . [burglary]') . . . courts have fashioned a distinction between the two [so that] the death penalty or life without the possibility of parole [are only imposed] on the most serious offenders." (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1025.) Special circumstance felony murder requires a showing additional to the offense of felony murder. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80–82 [rejecting due process challenge].) The special circumstance applies only when the evidence demonstrates "an independent or concurrent felonious purpose distinct from any intent to kill." (*People v. Riccardi* (2012) 54 Cal.4th 758, 836.) The burglary cannot be "merely 'incidental' or 'ancillary' to the murder." (*Ibid*.) This court-fashioned distinction is a clarification and not an independent element, but the trial court is required to instruct the jury " 'on its own motion, that the felony cannot have been merely incidental to the murder when there is evidence from which the jury could have inferred that the defendant did *not* have an independent felonious purpose for committing the felony.' "[9] (*Montelongo*, at p. 1026, italics added.) The quantum

[9] The jury was so instructed in Buchanan's case, and found that he had an independent purpose for committing the burglary.

of proof necessary to convict an actual killer of felony murder is not as great as that required for the jury to make a true finding as to the felony murder special circumstance. Buchanan's argument that he is no more culpable than a youthful offender convicted of felony murder without a special circumstance necessarily fails.

We also reject Buchanan's argument that a youthful offender who is convicted of intentional murder without a special circumstance finding is more culpable than an actual killer convicted of special circumstance felony murder. "[T]hose

---

With respect to the offense of felony murder, the jury was instructed under CALJIC No. 8.10 that to prove Buchanan guilty of felony murder, the prosecution had to prove that: "1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing occurred during the commission or attempted commission of burglary."

Buchanan's jury was instructed under CALJIC No. 8.81.17 that to find the burglary special circumstance true it must find that: "1. The murder was committed while the defendant was engaged in the commission of a burglary; and [¶] 2. The murder was committed in order to carry out or advance the commission of the crime of burglary or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the burglary was merely incidental to the commission of the murder."

Buchanan's argument—that the latter portion of CALJIC No. 8.81.17 regarding independent felonious purpose was superfluous because the prosecutor alleged that the burglary was not incidental to the murder—misses the mark. The prosecution's allegations do not relieve it of the burden of proof. The court's duty to instruct is based upon the sufficiency of the evidence, not the prosecutor's argument.

33

sentenced to LWOP have *also* been found, beyond a reasonable doubt, to have committed that first degree murder under one— or . . . more than one—of the special circumstances that reflect that the particular first degree murder was in some manner aggravated or reflected a greater risk of harm to persons other than the immediate murder victim or victims. [Citations.] As a result, youthful offenders who have been sentenced to LWOP have committed an aggravated form of first degree murder that distinguishes them from youthful offenders who have committed first degree murder but done so in the absence of any such aggravating factors." (*People v. Jackson* (2021) 61 Cal.App.5th 189, 199.) "[Special circumstance murder] is the most heinous crime known to our Penal Code, and one of the few crimes subject to the death penalty in California." (*Ngo, supra,* 89 Cal.App.5th at p. 123.)

The authorities that Buchanan relies upon to bolster his argument that our courts have held intentional murder without a special circumstance finding to be a greater crime than special circumstance felony murder are inapposite. Buchanan cites to *People v. Edwards* (2019) 34 Cal.App.5th 183, 197, for its characterization of *People v. Contreras* (2018) 4 Cal.5th 349, as confirming "that there is no crime as horrible as intentional first degree murder." As *Edwards* acknowledges, *Contreras* did not present an equal protection challenge to section 3051. (*Edwards, supra,* at p. 197.) *Contreras* held that imposing a sentence of 50 years to life on one-strike juvenile offenders for non-homicide crimes violated the Eighth Amendment. The passage to which *Edwards* referred compared the culpability of defendants who committed murder and those who committed non-homicide offenses: "In the death penalty context, the high court has said

34

" 'there is a distinction between intentional first-degree murder . . . and nonhomicide crimes against individual persons . . . . ' " (*Contreras*, *supra*, at p. 382, quoting *Kennedy v. Louisiana* (2008) 554 U.S. 407, 438.)  It did not address the relative culpability of those who commit special circumstance felony murder and those who commit intentional murder.  Nor did *Edwards*, which held that categorical exclusion of one-strike youthful offenders from youth offender parole hearings violates equal protection.  (*Edwards*, *supra*, at p. 195.)  The same is true of *People v. Caballero* (2012) 55 Cal.4th 262, 266, which Buchanan cites as support for his assertion that "murder differs from intentional murder in a 'moral sense'."  *Caballero* discussed the United States Supreme Court's opinion in *Graham v. Florida* (2010) 560 U.S. 48, and quoted *Graham* as follows:  "*nonhomicide crimes* differ from homicide crimes in a 'moral sense.' " (*Caballero*, *supra,* at p. 266, italics added.)  *Caballero* held that the imposition of a total sentence of 110 years to life on a juvenile offender for non-homicide crimes violated the Eighth Amendment.  Like *Contreras* and *Edwards*, it did not compare special circumstance felony murder to intentional murder.

In his reply brief, Buchanan asserts that *People v. Hardin* (2022) 84 Cal.App.5th 273, review granted January 11, 2023, S277487 (*Hardin*), which was issued after he filed his opening brief, supports his position.[10]  *Hardin* held that denying a youthful offender sentenced to LWOP a youth offender parole hearing violates equal protection.  *Hardin* reasoned that the Legislature's "purpose [in amending section 3051 to include

---

[10] The People discussed *Hardin* in the respondent's brief and take the position that the case was wrongly decided.

youthful offenders] was not to assess culpability or measure the appropriate level of punishment for various crimes, but 'to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20's.' " (*Id*. at p. 287.) Consequently, the court concluded that youthful offenders sentenced to LWOP were similarly situated to parole-eligible youthful offenders for purposes of the statute. (*Ibid*.) The court then concluded that, in light of section 3051's purpose, "there is no plausible basis for distinguishing between same-age offenders based solely on the crime they committed." (*Id*. at p. 288.) The *Hardin* court observed that even if it accepted "the premise that assessing relative culpability has a proper role in a statute expressly intended to recognize the diminished culpability of youthful offenders based on their stage of cognitive development . . . this superficially plausible justification for excluding offenders under age 26 sentenced to life without parole from eligibility for youth offender parole hearing is belied by the statutory provisions that allow such a hearing for individuals who have committed multiple violent crimes (albeit not special circumstance murder) and were sentenced to a technically parole-eligible indeterminate state prison term that is the functional equivalent of life without parole." (*Id*. at p. 289.) The court concluded that "[b]y defining the youth parole eligible date in terms of a single 'controlling offense,' rather than by the offender's aggregate sentence, the Legislature has eschewed any attempt to assess the offenders' overall culpability, let alone his or her amenability to growth and maturity." (*Ibid*.) *Hardin* rejected the suggestion that the classification created by section 3051 might be permissibly " 'imperfect' or somewhat under- or

overinclusive" because "the exclusion of young adult offenders sentenced to life without parole was a deliberate and focused choice, not an inadvertent consequence of broadly worded legislation." (*Id*. at p. 290.) The court also rejected the People's argument that the Legislature may choose to proceed incrementally to address a problem, because the Legislature recognized that the attributes of youth justified providing youthful offenders with a meaningful opportunity for parole, but categorically denied that opportunity to youthful offenders sentenced to LWOP. (*Ibid*.)

Prior to *Hardin*, all published cases that addressed the question of whether section 3051 violated equal protection by excluding youthful offenders sentenced to LWOP—including the opinion of another panel of this court—held that it did not. (*People v. Sands* (2021) 70 Cal.App.5th 193, 204–205 [First Dist., Div. Five]; *People v. Morales* (2021) 67 Cal.App.5th 326, 347—349 [First Dist., Div. Four]; *People v. Jackson*, *supra*, 61 Cal.App.5th at pp. 199—200 [Fourth Dist., Div. One]; *People v. Acosta* (2021) 60 Cal.App.5th 769, 780—781 [Fourth Dist., Div. Three]; *In re Williams* (2020) 57 Cal.App.5th 427, 433—436 [Second Dist., Div. Five]. Since *Hardin's* publication, the only court to consider the issue has disagreed with *Hardin*. (*Ngo*, *supra*, 89 Cal.App.5th at pp. 123—127.)

We decline to depart from this court's position in *In re Williams*, *supra*, 57 Cal.App.5th at page 436, that, even if we were to assume that a youthful offender sentenced to LWOP is similarly situated to an offender who is eligible for parole, "the Legislature reasonably could have decided that youthful offenders who have committed [crimes punishable by LWOP]—even with diminished culpability and increased potential for

rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration."[11]

As the Court of Appeal, Fourth District, Division Two has observed, " ' "A classification is not arbitrary or irrational simply because there is an 'imperfect fit between means and ends' " [citation], or "because it may be 'to some extent both underinclusive and overinclusive' " [citation]. Consequently, any plausible reason for distinguishing between [two classes] need not exist in every scenario in which the statutes might apply.' " (*Ngo*, *supra*, 89 Cal.App.5th at p. 126, italics omitted.)

The exclusion of youthful offenders who committed special circumstance felony murder from eligibility for a youth offender parole hearing is not a violation of due process. The trial court did not err in refusing to provide Buchanan a *Franklin* hearing.

### *Cruel and Unusual Punishment*

The Eighth Amendment to the United States Constitution, and article 1, section 17 of the California Constitution prohibit cruel and unusual punishment. When faced with a claim of cruel and unusual punishment under either the federal or state constitution, "[a] reviewing court determines whether a particular penalty given ' "is so disproportionate to the crime for

---

[11] In *In re Williams*, our concurring colleague found it unnecessary to opine as to "whether youth offenders sentenced to life without parole and those sentenced to parole eligible life terms are similarly situated with respect to their potential for growth and rehabilitation." (*In re Williams*, *supra*, 57 Cal.App.5th at p. 439 (conc. opn. of Baker, J.).) We need not decide the issue here.

which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235.)  "We . . . use a three-pronged approach to determine whether a particular sentence is grossly disproportionate.  First, we review 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' " (*People v. Johnson* (2010) 183 Cal.App.4th 253,  296.)  This analysis requires consideration of " 'the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts[,]' " as well as " 'the defendant's age, prior criminality[,] and mental capabilities.' " (*People v. Cole*, *supra*, 33 Cal.4th at p. 1235.)  "Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction.  [Citation.] Third, and finally, we compare the challenged punishment to punishments for the same offense in other jurisdictions. [Citation.]  The importance of each of these prongs depends upon the facts of each specific case[, and] . . . we may base our decision on the first prong alone." (*People v. Johnson*, *supra*, 183 Cal.App.4th at p. 297.)  " 'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. . . .  [Citation.]' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.)  " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*Ibid*.)

With respect to the first factor—the nature of the offender and the offense—with the exception of his youth, Buchanan does

not argue that there are any considerations that make either himself or the offense less deserving of punishment. He argues that the characteristics of juveniles that motivated the United States Supreme Court in *Miller v. Alabama* (2012) 567 U.S. 460, are the same as those of 22-year-old offenders like himself. *Miller* held that mandatory life imprisonment without parole for offenders under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment. No case has held that it is cruel and unusual punishment to sentence an adult convicted of special circumstance felony murder to LWOP.[12] Although California law has evolved to recognize the reduced culpability and greater potential for rehabilitation of youthful offenders who have committed lesser crimes, the Legislature has determined that those considerations do not outweigh culpability and the danger to society posed by youthful offenders sentenced to LWOP.

Moreover, nothing in the record indicates that Buchanan is less worthy of blame than the typical defendant who is convicted of special circumstance felony murder. The brutal nature of the killing and the manner in which it occurred indicates that it was not accidental. On the continuum of offenders who may be found guilty of special circumstance murder Buchanan clearly falls on the more blameworthy end of the spectrum.

---

[12] Without further discussion, Buchanan states that LWOP is akin to a death sentence, citing to *Graham*, *supra*, 560 U.S. at pages 69 to 70. *Graham* did not so hold. The opinion discussed certain similarities between the sentences, but acknowledged that they are not equivalent: "a death sentence is 'unique in its severity and irrevocability.' " (*Id*. at p. 69.)

Buchanan does not argue that the challenged punishment is greater than that prescribed for more serious crimes in California.  Nor does he argue that his punishment is cruel and unusual under the third factor by comparing it to the punishment for similar crimes in other jurisdictions.  Buchanan's sentence to LWOP does not violate the constitutional prohibition against cruel and unusual punishment.

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.


We concur:


RUBIN, P. J.


KIM, J.